UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KYONG OK YU, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>FIVE BOARS, LLC, et al.,<br><br>     Defendants. | NO.  C17-1249-JPD<br><br><br>MEMORANDUM OPINION |

## I.  INTRODUCTION

This matter was tried to the Court, sitting without a jury, on September 24-26, 2018. Dkts. 81, 82, 84.  Plaintiffs claim that defendants willfully failed to pay plaintiffs for all the hours they worked at the Seal's Motel between 2013 and 2016, in violation of the overtime provisions of the Fair Labor Standards Act ("FLSA").[1]  In addition, plaintiffs contend that defendants breached oral agreements to (1) purchase a restaurant or similar business valued at approximately $300,000 for the plaintiffs in exchange for their continued work at the motel; (2) provide plaintiffs with $30,000 cash for plaintiffs to start up a new business; and (3) give plaintiffs the value of three months rent plus a security deposit for a new apartment following

---

[1] Plaintiffs assert that because defendants' conduct was willful, the statute of limitations should be extended from two to three years and plaintiffs should be awarded liquidated damages.

MEMORANDUM OPINION - 1

the sale of the motel.  Defendants oppose plaintiffs' calculation of the damages owed under

FLSA, and ask the Court to enforce the two-year statute of limitations for plaintiffs' claims for

wages and find that any violation of FLSA was not willful.  Defendants further argue that any

other alleged promises, even if made, to pay plaintiffs additional sums are not legally

enforceable agreements.

The Court has now considered the evidence presented at trial, the exhibits admitted into

evidence, the parties' briefs, and the arguments of counsel.  This memorandum opinion will

constitute the Court's Findings of Fact and Conclusions of Law.

## II.  FACTUAL FINDINGS

The following facts have been admitted in this case pursuant to the Court's Order dated

August 28, 2018, or were established at trial.[2]  This case turned out to be a bitter family

dispute.  The animosity between the four major witnesses, plaintiffs Kyong Ok Yu and Un

Nam Yu ("Mrs. and Mr. Yu") and defendants Eun Kyu Kim and Chu Hwang Kim ("Mr. and

Mrs. Kim"), was evident throughout.  Unfortunately, this animosity led to no primary witness

being particularly credible.

Defendants Mr. and Mrs. Kim have owned the Seal's Motel, located at located 12035

Aurora Ave N, Seattle, WA 98133, since September 2006 when they purchased it for $2.25

million, until they sold it to a third party on or about August 2, 2016.  The motel has

approximately 38 rooms, and is more than fifty years old.  Defendant Five Boars, LLC, which

was entirely owned and managed by Mr. and Mrs. Kim, operated the business of the Seal's

Motel, while the Kims own the real property.  Five Boars, LLC dissolved in 2016.

---

[2] On July 19, 2018, plaintiffs moved the Court to admit as facts certain statements based on defendants' failure to respond to the request for admissions pursuant to Fed. R. Civ. P. 36. Dkt. 53.  *See also* Dkt. 54 (Park Decl.).  Defendants failed to respond to plaintiffs' motion, or the request for admissions.  Accordingly, on August 28, 2018, the Court granted plaintiffs' motion, and deemed the facts admitted.  Dkt. 66.

Seal's Motel is located on the "Aurora corridor," with a cluster of nearby motels which are mostly independently owned and operated. In addition to travelers, tourists, and out of state visitors, Seal's Motel customers regularly included long-term customers who often stayed more than one month, transients, and homeless persons who were supported by churches or governmental agencies. Over the years, the motel has had occasional difficulties with prostitutes, drug users, and transients.[3]

Before hiring the plaintiffs to work at the motel, the Kims worked in the front office of the Seal's Motel themselves as owner-operators. During this time, they performed the duties of motel clerk or receptionist, room cleaner, and handyman. While staffing the reception desk at the motel, defendants sometimes admitted customers at all hours, including from 10 p.m. to 8 a.m., and were awakened by customers ringing the buzzer or knocking on the front office door. Thus, defendants knew that motel customers could knock on the front office door between 10 p.m. to 8 a.m. to awaken the employee staying next to the front office for various concerns. Defendants had also posted the minimum wage and the overtime wage requirements poster in the laundry room below the employee quarter next to the Seal's Motel's front office, reflecting their understanding that they were required to pay the minimum wage and overtime wage to their motel employees.

In September 2010, defendants hired Mrs. Yu, who is Mr. Kim's cousin, as a motel employee. She worked at the motel from March 2010 to July 2016. Mrs. Yu worked primarily as a Seal's Motel's front office receptionist admitting and discharging the motel customers,

---

[3] For example, a dead woman was found at Seal's Motel in December 2013, who police suspect died as a victim of foul play or crime. Seattle Police shot and killed a knife-armed man at the motel in January 2009. The motel was temporarily shut down by Washington State Department of Health on or about June 2008 due to safety issues, including broken smoke detectors, soiled mattresses, exposed electrical wiring, and drug paraphernalia found in the motel rooms.

collecting room charges, making room availability reports, making room cleaning reports and occasionally cleaning motel rooms, and doing laundry of motel linens.  She also ordered motel supplies.  Mrs. Yu and her husband, Mr. Yu, stayed in the living quarters next to the Seal Motel's front office.  Mrs. Yu admitted Seal's Motel's customers at any time of the day or night as needed, and took care of customers' issues, security issues, and problems of the motel. Defendants were aware that Mrs. Yu rented out motel rooms to walk-in customers from 10 p.m. to 8 a.m. the following morning, based upon the revenues received from these transactions.  Defendants never made any attempt to stop Mrs. Yu from working between the hours of 10 p.m. to 8 a.m., or had any written policy (or initiated negative employment action) to discourage Mr. and Mrs. Yu from working overnight.   On the contrary, the motel's front office had an electric buzzer for customers to ring for an employee to assist them after-hours.

Defendants reported to the Washington State Employment Security Department and/or Department of Labor and Industries that Mrs. Yu worked 160 hours per month for Seal's Motel, for the employment period 2013 to 2016.  Defendants paid her a fixed salary, excluding taxes, of $3,000.00 per month.[4]  Defendants did not have a time clock to record the actual hours worked by the employees of Seal's Motel, and they did not record the actual hours worked by plaintiffs.

While Mrs. Yu was employed at the Seal's Motel, she was not a professional employee with a professional license, an executive employee, an administrative employee, or otherwise involved in the hiring/firing of employees, bookkeeping, accounting, tax reporting, payroll accounting, payroll check writing, vendor payments, or other administrative works.  Rather, Mr. and Mrs. Kim performed the hiring and firing of the employees, the bookkeeping,

---

[4] Defendants did not pay taxes (including social security taxes) on behalf of Mrs. Yu for the cash portion of the wages paid to her.  Moreover, plaintiffs did not declare their income for the cash portion received on their income taxes.

accounting, tax reporting, payroll accounting, payroll check writing, vendor payments, and other administrative works, in conjunction with their accountant.

Mr. Yu was employed by defendants at the motel from December 2013 to July 2016. Mr. Yu worked primarily as the Seal's Motel's handyman or occasional front office receptionist admitting and discharging the motel customers. As needed, he collected room charges, cleaned the motel parking lots, did security checks of the motel, and resolved issues with motel customers. He infrequently assisted in cleaning motel rooms and laundering motel linens as needed. Defendants reported to Washington State Employment Security Department and/or Department of Labor and Industries that Mr. Yu worked 80 hours per month between December 1, 2013 and December 31, 2015, and 70 hours per month between January 1, 2016 and July 31, 2016.[5] He was paid a salary of $2,000 per month.

Mrs. Yu worked more than eight hours per day, for the each day she worked for Seal's Motel, and more than forty hours per week for the years 2013-2016. However, defendants did not pay Mrs. Yu any overtime wage for the years 2013-2016. Although the Court granted plaintiffs' July 2018 motion to admit as facts certain statements based upon defendants' failure to respond to the requests for admissions, Dkt. 66, which included a request that defendants admit Mr. Yu also worked more than eight hours per day and more than forty hours per week for the years 2013-2016 without payment of overtime wages by defendants, the evidence received at trial was clearly to the contrary as will be explained below. Mr. Yu did not work more than eight hours per day, or more than forty hours per week. The evidence in this case will trump the finding that would otherwise be adopted due to the defendants' failure to respond to the requests for admission.

---

[5] Defendants did not pay taxes (including social security taxes) on behalf of Mr. Yu for the cash portion of the wages paid to him. In addition, plaintiffs did not declare the cash portion of his salary as income.

III.    DISCUSSION

A.    The Minimum Wage and Overtime Provisions of the Fair Labor Standards Act

The Fair Labor Standards Act ("FLSA") was enacted "to raise substandard wages and to give additional compensation for overtime work as to those employees within its ambit, thereby helping to protect this nation 'from the evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health.'" *U.S. v. Rosenwasser,* 323 U.S. 360, 361 (1945) (quoting Sen. Rep. No. 884 (75th Cong., 1st Sess.) at 4). The purpose of the statute is to guarantee "the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. One of its "principal purposes . . . is to ensure that employees are provided appropriate compensation for all hours worked." *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 913 (9th Cir. 2004). As a remedial statute, in construing the FLSA, courts "must be mindful of the directive that it is to be liberally construed to apply to the furthest reaches consistent with Congressional direction." *Biggs v. Wilson,* 1 F.3d 1537, 1539 (9th Cir. 1993) (citing *Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 211 (1959)). "The FLSA's minimum wage and overtime provisions are central among the protections the Act affords to workers." *Adair v. City of Kirkland,* 185 F.3d 1055, 1059 (9th Cir. 1999).[6]

---

[6] Specifically, § 206 of the FLSA, which sets forth the minimum wage requirement, provides:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at ... $7.25 an hour ...

29 U.S.C. § 206.

MEMORANDUM OPINION - 6

In addition to the minimum wage requirement, employers must pay employees who work more than 40 hours in a week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee…" 28 U.S.C. § 203(d).[7] Because neither Mr. nor Mrs. Yu's duties at the Seal's Motel trigger the administrative exception to FLSA's overtime pay requirements, the Court held in its Order Granting Plaintiff's Motion for Partial Summary Judgment that defendants owe the plaintiffs overtime pay for any of their qualifying work at the Seal's Motel. Dkt. 67. The issue that remains is the proper calculation of those wages.

B. Legal Standards Governing the Calculation of Overtime Wages

Plaintiffs argue that they are entitled to be paid for hours worked "at a rate not less than one and one-half times the [employee's] regular rate." RCW 49.46.130. Plaintiffs assert that because they "stayed at Seal's Motel and virtually worked 24 hours a day, 365 days a year," except for rare time off went they visited a casino or other places, they must be compensated for all of this time. Dkt. 73 at 3. Plaintiffs assert that it is defendants burden to establish evidence to refute plaintiffs' claim for "overtime pay for 24 hours a day, 365 days per year, going back to 3 years from the date of filing of this case, which is August 15, 2017, or unpaid

---

[7] The FLSA exempts several categories of employees from the overtime pay requirement, including "any employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). However, as the Court ruled in its August 29, 2018 Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, Dkt. 67, neither Mr. or Mrs. Yu's duties at Seal's Motel were administrative in nature. "[E]xempt administrative work is about running a business, not implementing its day-to-day operations." *Bollinger*, 863 F.Supp.2d at 1049 (*quoting Bratt,* 912 F.2d at 1070). Defendants concede that Mr. Yu undertook no administrate tasks, and Mrs. Yu implemented the motel's day to day operations, which involved a variety of duties, but she was not running the business. Rather, Mr. and Mrs. Kim performed the administrative functions of running the motel themselves.

overtime wages from August 16, 2014, to July 31, 2016, the last day of work, based on 28 U.S.C. § 255(a)." *Id.* at 4.

A salaried employee's hourly rate must be reverse engineered from a fixed weekly salary. If the parties fail to establish the number of hours they intended the salary to compensate, then the default assumption is that the salary was intended to cover forty hours of work. *See Monahan v. Emerald Performance Materials*, LLC, 705 F. Supp. 2d 1206 (W.D. Wash. 2010); *Fiore v. PPG Indus., Inc.*, 169 Wn. App. 325, 344 (2012) (calculating salaried employees' regular rate by dividing total compensation by forty hours). In some situations, courts depart from that default and apply the "fluctuating workweek" approach when, among other things, "there is a clear mutual understanding ... that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." *Inniss v. Tandy Corp.*, 141 Wn.2d 517, 525 (2000) (quoting 29 C.F.R. § 778.114).

29 C.F.R. § 785.22 governs jobs where employees are specifically on "duty of 24 hours or more." Specifically, the relevant portions of 29 C.F.R. § 785.22 provide as follows:

(a) General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked….

(b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the

employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time. (*See Eustice v. Federal Cartridge Corp.*, 66 F. Supp. 55 (D. Minn. 1946).)

In addition, 29 C.F.R. § 785.23 provides that "an employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own." The provision notes that it "is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted. This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home."

In *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Worker,* the Ninth Circuit addressed the issue of whether on-call waiting time, *i.e.,* time spent on-call but not actually working, is compensable overtime under the FLSA. 971 F.2d 347, 350 (9th Cir. 1992). In *Owens*, mechanics at a pulp mill sought overtime pay for on-call waiting time, and the court held that the two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are (1) the agreements between the parties and (2) the degree to which the employee is free to engage in personal activities. *Id.* (footnotes omitted) (holding that on-call waiting time was not compensable work because of the express, constructive and collective bargaining agreements between the parties).

With respect to the first predominant factor, the Ninth Circuit has consistently acknowledged the possibility of a collective bargaining agreement, constructive agreement, or

express agreement between the employer and employee regarding compensation for overtime, which may be relevant to the issue of on-call compensation.[8] The existence of such agreements, if any, can assist the trier of fact in determining whether the parties characterized the time spent waiting on-call as actual work.[9] Following the *Owens* decision, however, the court has consistently emphasized that focusing on the parties' agreements as a predominant factor is not intended to suggest that agreements are controlling regardless of the character of the uncompensated time at issue. *Id.* (citing *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 602 (1944) (FLSA was not designed to perpetuate contracts pursuant to which employers fail to compensate employees for work). In *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 941 (9th Cir. 2004), the Ninth Circuit Court of Appeal observed although an agreement between the parties is "a particular important benchmark for assessing how many hours the employees actually labored," such an agreement is not dispositive, and "should be accepted only if it is 'reasonable' in light of the 'pertinent facts.'" *Id.* "Properly understood . . . the parties' agreement is just the starting point of the FLSA overtime analysis . . . not its conclusion." *Id.* at 942.

The second predominant factor in determining whether on-call waiting time is compensable is "the degree to which the employee is free to engage in personal activities."

---

[8] An agreement may be found if employees are employed pursuant to a "collective bargaining agreement that provide[s] overtime compensation for actual call-in work, but not for other off-duty time." *Owens,* 971 at 355. A constructive agreement may arise if employees have been informed of the overtime compensation policy and continue to work under the disclosed terms of the policy. *Id.* at 354–355. Finally, an express agreement is created if the employees voluntarily accept the terms of the policy by becoming employed after an overtime compensation policy has been implemented. *Id.* at 355. *See also Berry v. County of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994).
[9] For example, an agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work. Conversely, an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work. *See Berry*, 30 F.3d at 1181.

*Owens,* 971 F.2d at 350. The proper inquiry is "whether [an employee] is so restricted during on-call hours as to be effectively engaged to wait." *Id.* at 354. The *Owens* court provided an illustrative, non-exhaustive list of factors to be analyzed in determining the degree to which an employee is free to engage in personal activities while on-call, which included the following:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Id.* at 351 (footnotes omitted). Because "[n]o one factor is dispositive," *id.,* a court should balance the factors permitting personal pursuits against the factors restricting personal pursuits to determine whether the employee is so restricted that he is effectively engaged to wait. *Berry*, 30 F.3d at 1183 (holding that all of the relevant factors, except perhaps one, weigh in favor of concluding the coroners are free to engage in personal activities while on-call).

The court in *Brigham*, which involved employees of an electric utility who resided on their employer's remote premises, noted that "the *Owens* factors provide a worthy lens through which to gauge the reasonableness of the parties' mutual assessment of the work equivalence of the time spent by employees on duty shifts in their on-premises homes." *Id.* at 941 (citing *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Worker,* 971 F.2d 347 (9th Cir. 1992)). In particular, the court noted,

> Four of the *Owens* factors – the existence of an on-premises living requirement, the severity of geographic restrictions, the response time associated with emergency alarms and calls, and he viability of pager use- seem somewhat duplicative in the context of on-site residence. Nonetheless, they speak to the pressures and other constraints imposed on employees by virtue of their on-call duties, and we see no reason why these factors cannot be accounted for as work time equivalents given the ways in which they diminished the otherwise unfettered enjoyment of the employees' time while on-call.

*Id.*

Thus, the *Brigham* court concluded that "rather than providing employers with an exception to the FLDSA overtime pay requirements, § 795.23 simply offers a sound methodology for calculating how many hours the employees actually worked within the meaning of FLSA. If that number exceeds 40 in a given workweek, the additional hours must be paid at the time-and-a-half rate demanded by 29 U.S.C. § 207(a)(1)." *Id.* at 942.

C. Calculation of Overtime Wages Owed to Mrs. and Mr. Yu

*1. Credibility of Witnesses*

The difficulty in calculating the hours worked by Mrs. and Mr. Yu in this case is due, in large part, to the complete lack of truthful testimony offered by the parties. The most credible witness at trial was Daniel Kim, the son of Mr. and Mrs. Kim, and the nephew of the plaintiffs. His lack of comfort about testifying against either his parents or his aunt and uncle was palpable. Moreover, the sparse briefing and evidence presented at trial leave the Court with a great deal of difficulty in calculating the appropriate amount of hours actually worked.

Mrs. Yu testified that she rarely, if ever, got more than 5 hours of sleep in a night, because she was continuously disrupted by customers coming in at all hours of the night and calls from residents staying there. According to her, she was busy 7 days per week on a 24 hour basis for the entire six years she worked there. She subsequently amended her testimony to account for time she had off on the weekends or occasionally during the week when her nephew, Daniel Kim, worked at the motel and spelled her. Similarly, Mr. Yu claimed to be working at the motel on a 24/7 basis, because he lived there and did not get more than five hours uninterrupted sleep.

Plaintiffs' testimony that their sleeping period was so frequently interrupted by a call to duty that they could not get at least 5 hours of sleep during the scheduled period the entire time was not believable. *See* 29 C.F.R. § 785.22 (governing jobs where employees are on "duty of 24 hours or more," and noting the general rule that where an employee cannot get at least 5 hours sleep during the scheduled period the entire time is counted as working time). As a result, it is not the case that plaintiffs were on duty for 24 hours or more, even though they lived and slept on the premises.

First, as to Mr. Yu, the evidence showed that he was employed as a handyman, and could pretty much work the hours he wanted to work. Although he was paid $2,000 per month as salary, there was no credible evidence that he worked even 40 hours per week. He lived at the motel with his wife, and when she got up to let in a late night customer, he allegedly watched on a monitor to make sure she was safe. However, he was not employed as motel security. Moreover, he was often gone, and only occasionally had to monitor his wife as she engaged in after-hours front office room letting, as discussed below. Because there is no credible evidence that he ever worked more than 40 hours per week, Mr. Yu's claim for damages and unpaid overtime wages fails.

Ms. Yu's testimony about the frequency of overnight interruptions by customers, or her inability to get 5 uninterrupted hours of sleep per night, was also not credible. Her testimony was credible that there were some occasions that she got out of bed to rent a room after official closing hours. However, Daniel Kim's testimony that after-hour room rentals took place, but were fairly infrequent, was far more credible than that of Ms. Yu.

Mrs. Kim's testimony that Mrs. Yu did not rent rooms after closing was also not credible—nor is her testimony that she instructed Mrs. Yu not to rent rooms after closing.

Mrs. Kim was aware that Mrs. Yu occasionally rented rooms after closing, notwithstanding any alleged instructions she may have given Mrs. Yu to the contrary.

    *2. Application of the* Owens *Factors to Hours Worked by Mrs. Yu*

Accordingly, despite the dearth of credible testimony in this case, the Court has considered the *Owens* factors to determine the degree to which Mrs. Yu was free to engage in personal activities while "on-call" at the motel. *See Owens,* 971 F.2d at 350. There was an on-premises living requirement, and Mrs. Yu had to obtain coverage for the front office of the motel from either her husband or a member of the Kim family before she could leave the premises. Mrs. Yu testified, however, that she was able to make advance arrangements for coverage from her nephew Daniel Kim or Mrs. Kim when she needed to leave the motel to run errands or engage in personal pursuits. Mrs. Yu also testified that she was frequently able to engage in personal activities, such as watching television, eating, napping, or playing games on her smart phone, during the day. *Id.*

The primary disagreement between the parties, as it relates to the hours worked by Mrs. Yu, appears to relate to the issue of whether the frequency of interruptions by customers – particularly overnight - was unduly restrictive. *Id.* at 351. *See also Berry*, 30 F.3d at 1183. Indeed, the vast majority of the testimony at trial related to this single issue. With respect to this *Owens* factor, the Court has considered the following evidence.

The motel's official hours were 8 a.m. to 10 p.m. After 10 p.m., the office was closed and locked, and the outdoor sign was turned on which would say "No Vacancy." All of this was designed to discourage people from coming to the office. Thus, the "open" hours of the office were 14 hours per day, and it is undisputed that Mrs. Yu was required to be at the Seal's Motel during the hours of 8:00 a.m. and 10 p.m. Approximately 60 % of the residents at the Seal Motel during the relevant time period were long term residents who treated the room as

their house or apartment.  Another significant percentage of the residents stayed on weekly

arrangements, because the rates were less expensive when staying for a week.  It was estimated

that the daily guests comprised a small percentage of the customers, perhaps 5 to 10 per day.

The guests staying as a home or on a weekly basis did not generally come to the front desk

after hours, because they were familiar with the operating hours of the front desk.  After hour

"transitory" guests who stayed at the motel were primarily there during the summer months,

when there were more tourists.

The best evidence of the frequency of the "after hours" interruptions comes from an

analysis of Exhibit 4, which is a collection of credit card receipts that have been segregated to

reflect credit card charges from before 8 a.m. and after 10 p.m.  The Court finds Exhibit 4 to be

representative in many ways of the after hour activities taking place at the motel during the

relevant time period.  Specifically, the receipts show more rentals in 2015 than in any other

year.  Accordingly, the Court undertook an analysis of the credit card receipts for 2015 set out

in Exhibit 4, and will use it to draw conclusions for the frequency of after-hour visits.[10]

Specifically, Exhibit 4 indicates that there were 71 credit card after-hour transactions in

2015 (after subtracting the 8 entries that reflected room rentals after 8 a.m. but before 9 a.m.).

Of those 71 entries, the great majority of them were in the April- July time period.  Moreover,

---

[10] There are, of course, some inherent problems using this extrapolation.  First, this
does not reflect cash room rentals.  However, the testimony was that perhaps only twenty
percent of the room rentals were paid for by cash.  Most room rentals were paid for by credit
card or housing voucher payments.  Second, there is no indication that Exhibit 4 represents all
of the after-hours credit transactions.  The Exhibit was submitted by the plaintiff, based on
culling credit card transaction documentation from the defendants.  However, it is the best
evidence available, and provides a credible basis for determining the truth about the amount of
after-hours work performed.

of these 71 entries, many are duplicate receipts[11] or duplicate entry times, indicating that more

than one room had been rented at the same time (and therefore there was only a single "wake

up").[12]  Of the total "after hours" entries, Daniel Kim could identify Mrs. Yu's handwriting on

about 35 occasions, several of which were duplicates.  The remaining 2015 entries had

someone else's handwriting on the receipt, or none at all.  This evidence corroborates Daniel

Kim's testimony that although after hours room rentals occurred, they did not occur as

frequently as alleged by Mrs. Yu.

     Daniel Kim testified that he would generally work at the motel on weekends – coming

in on Saturday around 5 p.m. and working until closing, and then working Sunday from 8 a.m.

to 6 p.m.  In addition, he worked at other times throughout the week if Mrs. Yu needed

additional coverage.  Mr. and Mrs. Kim also said they came in when needed and spelled the

plaintiffs, but the extent to which this happened (with the exception of the plaintiffs' two-

month trip to Korea) is not set out credibly in the record.

     Thus, the evidence indicates that Mrs. Yu worked five days per week (with the

exception of the two-month trip to Korea) from 8 a.m. to 10 p.m.  On Saturday, she worked

from 8 a.m. to 5 p.m., and on Sunday, she worked from 6 p.m. to 10 p.m.  In addition, she also

worked beyond 10 p.m. on occasion.  Following the Court's analysis of the credit card data,

---

[11] Daniel Kim testified that usually the room number of the room sold was written on the credit card receipt, which makes it easier to determine which credit card receipts are simply duplicates, as opposed to multiple rooms rented at the same time.

[12] *See e.g.*, Exs. 4-1 and 4-2 (duplicate copies of one receipt); 4-8 and 4-38 (duplicate copies of one receipt); 4-4 and 4-42 (duplicate copies of 1 receipt) ; 4-9 and 4-45 (duplicate copies of one receipt); 4-6 and 4-46 (duplicate copies of 1 receipt) 4-29 and 4-33 (two rooms, 12 minutes apart); 4-12 and 4-47 (duplicates of 1 receipts); 5-50, 4-13, and 4-49 (4-13 and 4-49 duplicates of 1 receipt and 4-50, 12 minutes earlier);  4-14, 4-54, and 4-55 (4-14 and 4-54 duplicates of 1 receipt, 4-55 separate simultaneous room rental); 4-19 and 4-56 (duplicates of 1 receipts); 4-17 and 4-59 (duplicates of 1 receipt), 4-16, 4-65, and 4-66 (4-16 and 4-66 duplicates of 1 receipts, 4-65 separate simultaneous room rental); 4-18 and 4-64 (duplicates of 1 receipt); and 4-123 and 4-124 (duplicates of 1 receipt).

the Court concludes that the appropriate calculation would lead to Ms. Yu being credited with one-half hour per week of after-hours duty for April 2015, and 2 hours of after-hours duty per week from May through July, 2015.[13]  She would also be entitled to one-half hour of after-duty work for the months of November and December 2015.  The Court will apply the same calculation for 2016 through the motel sale date of July 31, 2016, and the same calculation for the period of July 2014 through December 31, 2014.

Accordingly, Mrs. Yu should be credited with a base work credit of 14 hours per day for 5 days per week (8 a.m. to 10 p.m.).  She should also receive credit for weekend work of 9 hours on Saturday and 4 hours on Sunday.  This totals 84 hours per week, not counting her after-hours duty.  For 2015, her after-hours credit totals 27 hours (or about one-half hour per week for the year).  In sum, Ms. Yu should be credited with **84 ½ hours of work** per week for the relevant period.  It is undisputed that Mrs. Yu took off two months for a trip to Korea to visit her mother, yet she was paid.  When calculating the damages, Mr. and Mrs. Kim will be credited with the payments made to Mr. and Mrs. Yu for those two months ($10,000), and those two months will not be included in the calculation of the amounts due.  By contrast, Mr. Yu worked no overtime, and so his claim for overtime payments is dismissed.

### 3.  Salary Calculation for Mrs. Yu

It is undisputed that Mrs. Yu worked in excess of 40 hours per week, and was not paid overtime.  Although the Court finds that Mr. Kim believed that Mrs. Yu was exempt from FLSA's overtime requirements as a managerial employee, based on conversations with other motel managers and the fact that she was paid a salary even when she went to Korea, Mrs. Yu does not meet the managerial test to be exempt from overtime, as this Court has already

---

[13] Trial testimony establishes that it typically took between 5 and 10 minutes to handle check-in for a customer.

determined. See Dkt. 67 at 6-10. Accordingly, Mrs. Yu was entitled to receive 40 hours of pay at her ordinary rate. She, however, was also entitled to receive an additional 44 ½ hours of pay at her overtime rate per week, based on her then pay rate.

From 2013-2016, Mrs. Yu was paid a "salary" of $3,000 per month. To this salary must be added the housing benefit Mrs. Yu received by staying in the motel. *See Bao Yi Yang v. Shanghai Gourmet, LLC*, 471 Fed. Appx. 784, 786 (9th Cir. 2016) (reversing and remanding for the district court to reassess the FLSA overtime owed to the appellants because "[u]nder the FLSA . . . [the appellants'] regular rates of pay should have been determined by dividing their weekly salaries, including the value of the room and board provided to them, by the total number of hours that they worked each week."). The parties agree that the rental rate for the plaintiffs' rooms at the motel would have been $1,700. *See* Dkt. 86 at 11; Dkt. 87 at 3. Mr. and Mrs. Yu's wage, therefore, must each be increased by $850 per month, as discussed below. Dividing Mrs. Yu's salary of $3850 by 172 hours per month (4.3 weeks per month x 40 hours of work per week) results in an hourly wage of $22.38. Her overtime hourly wage would therefore be $33.57.[14] Accordingly, Ms. Yu should have been paid additional overtime wages of $142,514. From this figure, the unearned vacation pay for the two month trip will be deducted, resulting in a final wage due calculation of **$132,514** for the two year period of July 31, 2014 through July 31, 2016.

D. Liquidated Damages and the Statute of Limitations

The FLSA provides that civil actions to enforce the FLSA must be commenced within two years "except that a cause of action arising out of a willful violation may be commenced

---

[14] Thus, Mrs. Yu's damages are $33.57 (overtime hourly wage) times 44 ½ hours (the number of unpaid overtime hours) times the number of weeks she worked from July 31, 2014 through July 31, 2016. She didn't work for two months during this time, so the number of weeks would be 95.4 weeks (104 weeks, minus 8.6 weeks (4.3 weeks per month x 2)).

within three years after the cause of action accrued." 29 U.S.C. § 255(a). In *McLaughlin v. Richland Shoe Co.*, the U.S. Supreme Court held that in order to establish a willful violation of the FMLA, a plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." 486 U.S. 128, 133 (1988). *See also Alvarez v. IBP, Inc.*, 339 F.3d 984, 909 (9th Cir. 2003).

In addition, an employer who violates the overtime provisions of the FLSA shall be liable for the unpaid overtime compensation plus "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "The court in such action [as authorized by this provision] shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by defendant, and costs of the action." *Id.* If the employer shows to the satisfaction of the Court that the violation was in good faith and that the employer had reasonable grounds for believing that its conduct did not violate the FLSA, however, the Court has the discretion to deny or reduce the award of liquidated damages. 29 U.S.C. § 260. To avail itself of this defense, the employer must "establish that it had 'an honest intention to ascertain and follow the dictates of the Act' and that it had 'reasonable grounds for believing that [its] conduct complie[d] with the Act.'" *Local 246 Utility Workers Union of America v. Southern California Edison Co.*, 83 F.3d 292, 298 (9th Cir. 1996) (alterations in original) (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982)). If an employer fails to satisfy its burden under § 260, an award of liquidated damages is mandatory. *Id.* at 297 (citing *EEOC v. First Citizens Bank of Billings*, 758 F.2d 397, 403 (9th Cir. 1985)). Whether the employer acted in good faith and whether it had objectively reasonable grounds for its action are mixed questions of fact and law. *See Flores v. City of San Gabriel*, 824 F.3d 890, 904-05 (9th Cir. 2016).

To establish good faith, defendants rely exclusively on the testimony of Mr. Kim that he believed, albeit erroneously, that the position he offered Mrs. Kim fell within the managerial exception to the FLSA. This belief was based upon conversations he had with other local motel owners. The Court found this testimony credible, *i.e.*, Mr. Kim did subjectively believe that the FLSA was inapplicable, although this belief was not objectively reasonable under the circumstances. Mr. and Mrs. Kim did not conduct any investigation regarding their legal obligations to the plaintiffs apart from Mr. Kim's casual conversations with other motel owners. Defendants did not seek any professional advice to confirm their assumptions, and relied instead upon plaintiffs' failure to complain about the denial of overtime pay. An employer who "failed to take the steps necessary to ensure [its] [ ] practices complied with [FLSA]" and who "offers no evidence to show that it *actively endeavored* to ensure such compliance" has not satisfied § 260's heavy burden. *Flores*, 824 F.3d at 905 (citing *Alvarez v. IBP, Inc.*, 339 F.3d 894, 910 (9th Cir. 2003) (alterations in original)).

The Court finds that under the circumstances, defendants' conduct amounted to reckless disregard for whether defendants' conduct was prohibited by the statute, and therefore was "willful." Significantly, the Court finds it highly likely that if defendants had hired non-relatives to operate their motel's front office, they would have conducted a more thorough investigation of their legal obligations as employers. Instead, the defendants took their familial relationship with the plaintiffs for granted, and conducted no such investigation.

Despite the defendants' reckless disregard for whether their treatment of the plaintiffs violated the FLSA, the Court finds that the complicated familial relationship between the parties mitigates against awarding full liquidated damages in this case, or extending the statute of limitations period from two to three years. Although it is clear that defendants wrongfully failed to pay plaintiffs overtime wages, they were also clearly motivated on numerous

occasions to help the plaintiffs with their financial struggles. Accordingly, the Court will award liquidated damages of half the amount of unpaid overtime, or **$66,207**, and also award plaintiffs their attorney's fees and costs of this action. However, it would not be just, or further the purposes of the Act, to extend the statute of limitations period in this case, which essentially involves a bitter family dispute.

E. Plaintiffs' Additional Claims for a $300,000 Business, $30,000 Start Up Cash, and the Value of Three Months Rent Plus a Security Deposit

The parties' final dispute in this case relates to whether defendants made enforceable promises to the plaintiffs to purchase them a new business worth approximately $300,000, gift them $30,000 start up cash for a new business, as well as the value of three months rent plus a security deposit for a new apartment.

In Washington, an implied contract exists if there is an offer; there is an acceptance; the acceptance is in the terms of the offer; it is communicated to the offeror; there is mutual intention to contract; and there is a meeting of the minds of the parties. *Milone and Tucci, Inc. v. Bona Fide Builders, Inc.,* 49 Wash.2d 363, 301 P.2d 759, 762 (1956). There is simply insufficient evidence to support the conclusion that defendants intended to create a distinct contract, or that the parties reached a meeting of the minds, with respect to any of plaintiffs' final claims.

It is undisputed that the parties' relationship unraveled in August 2016, following defendants' sale of the Seal's Motel. Plaintiffs had moved out of the motel following the sale, and were living in defendants' home in Spanaway, Washington. Although Mrs. Kim testified that prior to the sale of the Seal's Motel, she had offered to gift $30,000 cash to plaintiffs to help them start a new business, shortly after the motel sold Mrs. Kim advised Mrs. Yu that she did not have the $30,000 cash on hand as expected because the sale proceeds were tied up in a

1031 exchange. Mrs. Kim told Mrs. Yu that she would have to give her the promised $30,000 at a later date, which upset Mrs. Yu and caused plaintiffs to pack up and move out of the defendants' home. Although Mrs. Kim also offered to pay for three months rent plus a security deposit so the plaintiffs could afford to get a new apartment, plaintiffs declined her offer. Mrs. Yu also told Mrs. Kim that she did not want the promised $30,000 cash. Thus, neither Mrs. Kim's offer to gift plaintiffs $30,000 cash, or pay three months rent plus a security deposit, constituted anything more than an offer of a gift, which was declined by the plaintiffs. There is no evidence that Mrs. Kim's offers were made in consideration for services rendered at the motel, or any other services. Rather, her offers appear to been motivated by the parties' close, familial relationship.

Similarly, plaintiffs' final contention that the defendants promised to purchase them a new business worth approximately $300,000 when the Seal's Motel sold in 2016, appears to have been based upon a large misunderstanding between the two families. Plaintiffs contend that defendants dangled an offer to purchase them a new business as inducement to keep the plaintiffs employed at the motel for months before the motel ultimately sold, despite plaintiffs' express dissatisfaction with the dangerous working conditions. Mrs. Yu's sister, Kyong Jayne Lee, who came to visit after the sale of the motel and lived in the Spanaway home with the two families for several weeks, was also under the impression that the defendants intended to purchase a new commercial business on behalf of the plaintiffs. Ms. Lee testified that the two families took a lot of day trips in the greater Seattle area while the defendants looked for a new commercial investment. Ms. Lee believed that Mr. and Mrs. Kim were going to purchase the new business for the plaintiffs to own and operate as compensation for their years of work at the Seal's Motel, although she did not hear the specific terms of the agreement discussed during her visit. Mrs. Yu testified that she did not really believe that defendants would ever

make good on their promise, and in fact only thought there was a "50/50 chance" that they would ever follow through.[15] However, when the Yus, Kims, and Ms. Lee were all looking at businesses together worth approximately $200,000-300,000 after the sale of the motel, Mrs. Yu assumed that one of these businesses would be purchased for her and her husband to own and operate.

By contrast, defendants testified that they certainly never discussed a sum of $300,000 with plaintiffs, and they also never promised to purchase them a new business to own and operate. At most, Mr. Kim testified that they had discussed the possibility of giving the plaintiffs some "start up" money, such as $30,000, to purchase their own business, and this money could then be repaid to defendants at a later date once the business was making a profit. Mr. and Mrs. Kim testified that they were looking at new commercial properties as potential new investments for themselves, and at most, they would have allowed plaintiffs to work there as employees.

Especially in light of Mrs. Yu's testimony that she did not actually expect the defendants to purchase plaintiffs a new business, there is no evidence that a sufficient meeting of the minds occurred with respect to the plaintiffs' claim for a business valued at approximately $300,000. There is insufficient evidence to support the conclusion that defendants intended to create a contract, or that the parties mutually agreed on the necessary material terms. Accordingly, plaintiffs' claims for additional compensation based upon allegedly unfulfilled promises made by defendants fail.

---

[15] Ms. Yu also testified that the specific sum of $300,000 never came up, but defendants were looking at businesses such as grocery stores and teriyaki restaurants which cost approximately $200,000 - $300,000 to purchase.

IV.   CONCLUSION

Accordingly, the Court finds that Mrs. Yu is entitled to judgment in the amount of $132,514 for 2015 and 2016, plus liquidated damages of $66,207, for a total judgment of **$198,721**, plus attorney's fees and costs. Mr. Yu is not owed any additional overtime compensation. Plaintiffs' remaining claims are DISMISSED with prejudice.

The Clerk is directed to send a copy of this Order to counsel for both parties.

DATED this 17th day of October, 2018.

*James P. Donohue*
_____
JAMES P. DONOHUE
United States Magistrate Judge